UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

MELANIE MARTIN,

     Plaintiff,

v.

CIENA HEALTH CARE MANAGEMENT,
INC., d/b/a Ciena Healthcare, and
REGENCY AT TROY, LLC,

          Defendants.

Case No. 25-cv-

Hon.

| | |
|---|---|
| ERIC STEMPIEN (P58703)<br>MALLORIE M. BLAYLOCK-DANNA (P84331)<br>STEMPIEN LAW, PLLC<br>Attorneys for Plaintiff<br>38701 Seven Mile Road, Suite 445<br>Livonia, MI 48152<br>P/F: (734) 744-7002<br>eric@stempien.com<br>mallorie@stempien.com | |

## **COMPLAINT AND JURY DEMAND**

     Plaintiff, MELANIE MARTIN, by and through her attorneys, Stempien Law,

PLLC, hereby complains against Defendants, CIENA HEALTH CARE

MANAGEMENT, INC., d/b/a Ciena Healthcare, and REGENCY AT TROY, LLC,

jointly and severally, and in support thereof states:

1.    Plaintiff MELANIE MARTIN ("Martin" or "Plaintiff") is a resident of Clinton

    Township, Macomb County, Michigan.

1

2.    Defendant CIENA HEALTH CARE MANAGEMENT, INC., d/b/a Ciena

Healthcare, ("Defendant Ciena") is a domestic for-profit corporation that

conducts systematic and continuous business in Southfield, Oakland County,

Michigan; its resident agent for service of process being: Tami L. Hunt, 4000

Town Center, Suite 2000, Southfield, MI 48075.

3.    Defendant REGENCY AT TROY, LLC ("Defendant Regency") is a domestic

limited liability company that conducts systematic and continuous business in

Troy, Oakland County, Michigan; its resident agent for service of process

being: Tami L. Hunt, 4000 Town Center, Suite 2000, Southfield, MI 48075.

4.    Jurisdiction is vested with this Court pursuant to 29 USC §1132(e)(1), 29 USC

§2601, et. seq., and 28 USC §1331.

5.    Venue is proper in this District pursuant to 28 USC §1391(c) and (d), and 29

USC §1132(e)(2).

### COMMON ALLEGATIONS

6.    Defendant Ciena is the parent company of Defendant Regency.

7.    At all relevant times, Martin was an employee of Defendants and Defendants

were her employer.

8.    On November 14, 2023, Defendants offered Martin the position of Licensed

Practical Nurse in its Nursing Department.

2

9. On or about December 5, 2023, Martin began her employment with Defendants at their rehab nursing home, Regency at Troy, as a Licensed Practical Nurse.

10. On or about November 10, 2024, Martin was promoted to the position of Weekend Supervisor of floor nurses and Certified Nurse Practitioners.

11. In or about November 2024, Martin learned that her husband, a U.S.A. Paralympic athlete, would have to undergo surgery in February 2025 relative to his waist-down paralysis, a serious medical condition.

12. In November 2024, Martin informed her Supervisor and Defendants' Director of Nursing, Shannon Rowden ("Supervisor/DON Rowden"), as well as Defendant's scheduler, and Defendants' Human Resources ("HR") representative, Sarah Brown ("HR Rep Brown")  of Martin's husband's upcoming surgery, that she would need to take some time off work to care for him, and that she would provide additional information as soon as she learned it at her husband's December 2024 follow-up medical appointment.

13. At Martin's husband's December 2024 medical appointment, Martin learned that her husband would require six weeks of care following his February 2025 surgery, as he would be required to be on his stomach.

14. Following Martin's husband's December 2024 medical appointment, Martin verbally informed Supervisor/DON Rowden that she would require six weeks

of leave pursuant to the Family Medical Leave Act, 29 USC §2601, et. seq. ("FMLA") beginning on February 1, 2025.

15. Supervisor/DON Rowden advised Martin that, under the FMLA, Martin was entitled to take 12 weeks of FMLA leave. Martin still only requested 6 weeks.

16. In or about late-December 2024, Martin advised Defendants' HR that she would require 6 weeks of FMLA leave and that she had already advised Supervisor/DON Rowden of the same.

17. Until the very end of Martin's employment, she and Defendants did not communicate by email for reasons unbeknownst to Martin.

18. In January 2025, Supervisor/DON Rowden texted Martin and asked her to put her FMLA leave request in writing.

19. On or about January 20, 2025, Supervisor/DON Rowden told Martin via text message that Martin needed to put her FMLA leave request in writing and confirmed that Defendants' Administrator, Brad Peruski ("Administrator Peruski") would approve the leave request.

20. On or about January 21, 2025, Martin noticed some discrepancies in her paycheck. She contacted Defendants' payroll and learned that Defendants changed her position to wound care nurse, that she is scheduled to work only eight-hour shifts, that she is not eligible for holiday pay because payroll records

showed that Martin was absent, and that she no longer receives her shift differential because wound care nurses are not eligible for it.

21. On January 21, 2025, Martin advised Supervisor/DON Rowden of what payroll told her and Martin requested to be told her current rate of pay, if there was any additional compensation she may receive, and requested a clear outline of her job responsibilities.

22. Martin is not qualified to be a wound care nurse. She had never worked as a wound care nurse and was never trained to be a wound care nurse.

23. Accepting the demotion to wound care nurse would have jeopardized Martin's professional license, as well as the safety and wellbeing of Defendants' patients.

24. Defendants cut Martin's rate of pay when they demoted her to wound care nurse.

25. On January 25, 2025, Martin texted Supervisor/DON Rowden again, stating that she was not paid her holiday pay for New Years Day because she was marked as absent and that payroll advised Martin that she would have been paid said holiday pay if she had not been marked as absent.

26. On February 1, 2025, Martin authored a handwritten leave of absence request for her FMLA leave, as she was directed by her supervisor and HR to do, which explicitly requested that Defendants provide her with any forms she would need to complete to further formalize her request.

5

27. On February 1, 2025, Martin provided physical copies of her handwritten leave of absence request to Supervisor/DON Rowden, HR Rep Brown, and Administrator Peruski.

28. On February 1, 2025, Martin's FMLA leave began.

29. On February 2, 2025, Supervisor/DON Rowden texted Martin, asking if she was coming into work. Martin then reminded Supervisor/DON Rowden that she was on FMLA leave. Supervisor/DON Rowden did not respond.

30. Martin was off work, on FMLA leave from February 2, 2025 through March 4, 2025, a 4.3-week period.

31. On March 4, 2025, 4.3 weeks into her leave of absence, Martin texted Supervisor/DON Rowden and HR Rep Brown, asking what she needs to do to return to work. Neither responded.

32. Between March 4 and 10, 2025, Martin called and left voicemails, in further efforts to return to work, to no avail.

33. On March 10, 2025, Martin texted Supervisor/DON Rowden and HR Rep Brown, again, stating that she has called, left voicemails, and sent text messages about returning to work from her leave of absence; and requested confirmation that she still held her Weekend Supervisor position. HR Rep Brown responded stating, "I would reach out to [Supervisor/DON Rowden] as to when you are returning." Supervisor/DON Rowden stated, "I will call later today."

34. Supervisor/DON Rowden did not call Martin on March 10, 2025, and as such, Martin contacted Defendants' corporate office, asking what her employment status was. Defendants' corporate office advised Martin to contact HR.

35. On March 11, 2025, Martin again texted Supervisor/DON Rowden and HR Rep Brown asking for clarification on whether she still had a position with Defendants. Martin also provided a status update concerning her husband's condition and requested that she be provided with information on how she can return to work.

36. On March 16, 2025, Supervisor/DON Rowden responded to Martin's text message from 5-days earlier, stating that she would call Martin tomorrow.

37. On March 17, 2025, Martin and Supervisor/DON Rowden spoke on the phone. Martin provided a status update concerning her husband's condition and asked what she needed to do to return to work.

38. Supervisor/DON Rowden then advised Martin that, "well, you didn't have an official leave because, I told you, you know, that we had to get it in writing and it had to get approved, you know, and all of that, that had to go through [Administrator Peruski]…" and "you can come back. I'm just letting you know, like, you were never on a personal leave, because a personal leave, if you look in your handbook, you have to apply for it in writing and it has to be approved through the administrator; so that would be for an extended period of time off."

39. Supervisor/DON Rowden further stated that "you have to – because it has to go through so that you show that you have a personal leave. You didn't qualify for, you know, FMLA or you didn't apply for it or, you know, so this is a way to, you know, keep [*inaudible*] things like this when you have, you know,  but it all has to be done, you know, in writing, the right way."

40. Supervisor/DON Rowden then clarified, stating that Martin's leave was not approved because the approval was not in writing. This is despite Supervisor/DON Rowden's text message unequivocally stating that Administrator Peruski would approve Martin's request for leave; specifically, Supervisor/DON Rowden told Martin "He will approve it."

41. Supervisor/DON Rowden then stated that, "you can come back, but you can come back as like, a floor nurse, you know, and I'm willing to work with your schedule, you know, whatever works, you know, for you." and "You know, we can work it around because I know you got a lot going on. And that might be, you know, a little bit better for your scheduling stuff too. You know, it's up to you, you know, but I just – this is what my thought is that, you know, you come back as a floor nurse."

42. Martin and Supervisor/DON Rowden then discussed Martin's husband's surgeries scheduled for the end of April 2025, which was to consist of three doctors performing three different surgeries, and Martin pressed

8

Supervisor/DON Rowden to provide her with specifics on what she must do to have that FMLA leave requested and approved in writing.

43. Supervisor/DON Rowden then apprised Martin of Defendants' written FMLA policies for the first time *ever* and told Martin that her February 2025 leave was not FMLA leave because she "did not provide documentation."

44. It then became clear that Defendants failed to provide Martin with a copy of their Employee Handbook since its June 4, 2024 update, as the only Handbook Martin had at that time was the version she received at orientation in 2023.

45. Supervisor/DON Rowden then told Martin that Defendants already hired a new afternoon supervisor and a new midnight supervisor, and that she would have Defendants' scheduler, Jan, reach out to Martin on March 18, 2025 to get Martin back at work and on the schedule.

46. Martin asked if she could return to her 16-hour (7:00 a.m. to 11:00 p.m.) midnights shift, but Supervisor/DON Rowden told Martin that Defendants already have "quite a lot" of nurses working midnights and instead offered to have Martin work a 12-hour day shift on the weekends.

47. In or about March 2025, Martin was advised by Administrator Peruski that he remembers seeing Martin's handwritten FMLA leave request, but "[he] didn't really read it that closely when [Martin] initially requested the time off."

48. Martin told Administrator Peruski that she was not quitting her Supervisor position, but felt that she was fired. Administrator Peruski responded only by stating, "ok."

49. On or about March 21, 2025, HR Rep Brown advised Martin that: Martin was "more than welcome to return, but my understanding is that the position available is a floor nurse position."; Martin's February 2025 leave "was approved" and that her "understanding is that it was approved."; HR Rep Brown did not know until 3 or 4 days ago that there is an "actual form" for FMLA because her "understanding was that they (employees) just submit it in writing and, okay!"; Martin only "took a leave of absence," a "personal leave of absence," and "not FMLA"; and that HR Rep Brown did not know that Martin's leave of absence "was not approved."

50. Defendants' Employee Handbook (revised June 4, 2024) provides that:

> **Personal Leave of Absence**
> The facility may provide eligible Staff Members with the opportunity to take a leave of absence up to sixty (60) calendar days for personal reasons.
>
> - **Personal Leave of Absence:**
>   A personal leave of absence is a leave for a Staff Member's personal reasons that do not qualify for job protected leave. Supporting documentation may be required.
>
> - **Qualifying for Leave**
>   Staff Members are eligible to apply for a personal leave of absence, after completing the probationary period, for

personal reasons that don't otherwise qualify for job protected leave.

51. Martin's leave of absence was not being taken for personal reasons that do not qualify for job protected leave.

52. Martin's leave of absence did not qualify as a "personal leave of absence," according to Defendants' own policy.

53. On March 24, 2025, HR Rep Brown told Martin that *she* (HR Rep Brown) must provide FMLA paperwork to Martin so that Martin could get the paperwork completed and that HR Rep Brown would provide that paperwork to Martin on March 25, 2025. HR Rep Brown did not provide said paperwork to Martin on March 25, 2025.

54. On March 24, 2025, Martin texted HR Rep Brown asking what Martin's job title and pay were. HR Rep Brown did not respond.

55. On March 31, 2025, Martin texted HR Rep Brown asking what Martin's title and position were, and what her return-to-work date is. HR Rep Brown did not respond.

56. On April 3, 2025, Martin texted HR Rep Brown asking, again, what date she can return to work. HR Rep Brown did not provide a date.

57. On April 4, 2025, HR Rep Brown left the FMLA documentation at the reception desk, which provided that Martin was to return to work as a wound care nurse.

58. On April 7, 2025, Martin asked HR Rep Brown to confirm that the documentation was accurate and that Martin would be returning to work as a wound care nurse. HR Rep Brown stated that it is her understanding that Martin would be "returning to how things were before [Martin] went off on 2/1."

59. On April 7, 2025, Martin asked HR Rep Brown to confirm that Martin would be returning to work as the Weekend Supervisor and work her normal shift. HR Rep Brown did not respond.

60. As of April 10, 2025, 5 weeks and 2 days after Martin requested to return to work, Martin was still not back at work and still not being paid, despite her best efforts. As such, Martin had been constructively discharged and she was forced to resign.

## COUNT I – VIOLATION OF FMLA – INTERFERENCE

61. Plaintiff hereby incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein.

62. Martin was an eligible employee as that term is defined by the FMLA.

63. Defendants are covered employers as that term is defined by the FMLA.

64. Martin's leave that began in February 2025 was protected by the FMLA.

65. Martin's position as the Weekend Supervisor should have been protected by the FMLA until her return to work.

66. Defendants interfered with Martin's rights under the FMLA by:

a. Denying her access to Defendants' FMLA leave policies and procedures that were then in effect;

b. not paying her holiday pay for New Years Day 2025 that she was entitled to pursuant to her shift differential as the Weekend Supervisor;

c. removing her shift differential entirely;

d. refusing to provide her with competent, accurate instruction on what she must do to take FMLA leave;

e. failing to provide her with FMLA paperwork/documentation;

f. replacing her Supervisor position before she returned to work;

g. demoting her to the Wound Care Nurse position;

h. attempting to demote her to the Floor Nurse position;

i. decreasing her rate of pay;

j. decreasing her scheduled working hours to zero;

k. refusing to allow her to return to work, despite her numerous requests do to so beginning on March 4, 2025;

l. denying that she ever took FMLA leave;

m. retroactively denying that her FMLA leave was approved;

n. wrongly categorizing her FMLA leave as a "personal leave of absence;"

o. among others.

67. As a direct and proximate result of Defendants' interference with Martin's FMLA rights, Martin suffered damages, including, but not limited to wage loss, lost employment benefits and lost pension benefits, plus interest, costs and attorney fees as allowed by statute.

68. Further, because Defendants' violation of FMLA was not in good faith and Defendants did not have reasonable grounds for believing that the demotion and replacement was not a violation of FMLA, Plaintiff is entitled to an award of liquidated damages pursuant to 29 USC §2617(a)(1).

## COUNT II – VIOLATION OF FMLA –RETALIATION/DISCRIMINATION

69. Plaintiff hereby incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein.

70. By demoting and replacing Martin, Defendants retaliated and/or discriminated against Martin for exercising her FMLA rights.

71. By denying Martin access to Defendants' FMLA leave policies and procedures that were then in effect, Defendants retaliated and/or discriminated against Martin for exercising her FMLA rights.

72. By not paying Martin her holiday pay for New Years Day 2025 that she was entitled to pursuant to her shift differential as the Weekend Supervisor, Defendants retaliated and/or discriminated against Martin for exercising her FMLA rights.

14

73.  By removing Martin's shift differential entirely, Defendants retaliated and/or discriminated against Martin for exercising her FMLA rights.

74.  By refusing to provide Martin with competent, accurate instruction on what she must do to take FMLA leave, Defendants retaliated and/or discriminated against Martin for exercising her FMLA rights.

75.  By failing to provide Martin with FMLA paperwork/documentation, Defendants retaliated and/or discriminated against Martin for exercising her FMLA rights.

76.  By replacing Martin's Supervisor position before she returned to work, Defendants retaliated and/or discriminated against Martin for exercising her FMLA rights.

77.  By demoting Martin to the Wound Care Nurse position, Defendants retaliated and/or discriminated against Martin for exercising her FMLA rights.

78.  By attempting to demote Martin to the Floor Nurse position, Defendants retaliated and/or discriminated against Martin for exercising her FMLA rights.

79.  By decreasing Martin's rate of pay, Defendants retaliated and/or discriminated against Martin for exercising her FMLA rights.

80.  By decreasing Martin's scheduled working hours to zero, Defendants retaliated and/or discriminated against Martin for exercising her FMLA rights.

81. By refusing to allow Martin to return to work, despite her numerous requests do to so beginning on March 4, 2025, Defendants retaliated and/or discriminated against Martin for exercising her FMLA rights.

82. By denying that Martin ever took FMLA leave, Defendants retaliated and/or discriminated against Martin for exercising her FMLA rights.

83. By retroactively denying that Martin's FMLA leave was approved, Defendants retaliated and/or discriminated against Martin for exercising her FMLA rights.

84. By categorizing Martin's FMLA leave as a "personal leave of absence," Defendants retaliated and/or discriminated against Martin for exercising her FMLA rights.

85. As a direct and proximate result of Defendants' violation of the FMLA, Plaintiff suffered damages as fully set forth herein.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury of the within cause.

Respectfully submitted,

STEMPIEN LAW, PLLC

*/s/ Mallorie M. Blaylock-Danna*

MALLORIE M. BLAYLOCK-DANNA (P84331)
Attorneys for Plaintiff
38701 Seven Mile Road, Suite 445
Livonia, MI 48152
P/F: (734) 744-7002
mallorie@stempien.com

Dated: June 23, 2025

17